IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:22-cr-00240-AN-1 |
| v. | |
| SALWAN W. ADJAJ, | OPINION AND ORDER |
| Defendant. | |

On October 24, 2023, defendant Salwan Adjaj filed this Motion to Reduce Sentence under 18 U.S.C. § 3582(c)(1)(A)(i). The government opposes the motion. Oral argument was held on January 23, 2024. The Court reviewed *in camera* information obtained by the government from the Bureau of Prisons ("BOP"), and defendant filed a Motion to Allow Defense Counsel to Review those submissions. For the reasons set forth below, defendant's Motion to Reduce Sentence and Motion to Allow Defense Counsel to Review Government's *In Camera* Submission are DENIED.

## LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court may modify a term of imprisonment if (1) the defendant has fully exhausted his administrative remedies; (2) the Court finds that "extraordinary and compelling reasons warrant such a reduction"; (3) the Court considers the relevant factors in 18 U.S.C. § 3553(a); and (4) reducing the defendant's sentence is consistent with applicable policy statements issued by the Sentencing Commission.

Pursuant to U.S. Sentencing Guideline ("USSG") § 1B1.13(b)(1)(C), "extraordinary and compelling reasons exist" if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." This category for an "extraordinary and compelling reason" was recently added via amendment to the USSGs and became effective as of November 1, 2023. However, the Ninth

Circuit has indicated, and continues to indicate post-amendment, that USSG § 1B1.13 is not an "applicable policy statement," and is thus persuasive, but not binding, authority. *See United States v. Holmes*, No. 23-420, 2023 WL 8108461, at *1 (9th Cir. Nov. 22, 2023) (citing *United States v. Aruda*, 993 F.3d 797 (9th Cir. 2021) favorably for proposition that § 1B1.13 is persuasive, not binding, authority).

18 U.S.C. § 3553(a) includes the following factors:

> "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> "(2) The need for the sentence imposed –
> "(A) to reflect the seriousness of the offense, to promote the respect for the law, and to provide just punishment for the offense;
> "(B) to afford adequate deterrence to criminal conduct;
> "(C) to protect the public from further crimes of the defendant; and
> "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> . . . .
> "(4) the kinds of sentence and the sentencing range established for –
> "(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines–
> (i) issued by the Sentencing Commission . . . ;
> . . . .
> "(5) any pertinent policy statement –
> "(A) issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(2) . . . that is in effect on the date the defendant was sentenced; and
> "(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
> "(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> "(7) the need to provide restitution to any victims of the offense."

## BACKGROUND

**A.    Procedural History**

Defendant was arrested on complaint on October 18, 2021 for aggravated identity theft and wire fraud. Govt.'s Opp'n to Def.'s Mot. to Reduce Sent. ("Govt.'s Opp'n"), ECF [93], at 11. His charges stemmed from a wire fraud scheme wherein defendant fraudulently applied for, and received, a number of COVID-relief funds using both his own name and stolen identities. *Id.* Defendant was released from custody that same day, October 18, 2021, subject to several pre-trial release conditions, including requirements that he not commit new crimes, access only one approved financial account, and not use the internet. *Id.* However, on October 19, 2021, defendant used a newly-acquired smartphone to access

undisclosed online brokerage accounts that he had funded with the fraudulently received loans/grants. *Id.* at 12. As a result, defendant was arrested on December 15, 2021 for pre-trial release violations. *Id.* Magistrate Judge Stacie Beckerman issued a detention order on December 17, 2021 to remand defendant into custody. Order of Detention, ECF [25], at 1. In that order, Judge Beckerman found that no condition would reasonably assure defendant's appearance due to his foreign citizenship, mental health issues, and dishonesty/performance on supervision. *Id.* Further, Judge Beckerman found that no conditions would reasonably assure the safety of the community based on the nature of defendant's offense, his mental health issues, and his dishonesty/performance on supervision. *Id.* Defendant has been in custody since December 17, 2021. Govt.'s Opp'n 12.

On September 13, 2022, defendant pled guilty to one count of wire fraud and one count of aggravated identity theft. Plea Pet., ECF [53], ¶ 23. On February 16, 2023, U.S. District Judge Michael Mosman sentenced defendant to seventy months imprisonment (forty-six months for wire fraud, and twenty-four months for aggravated identity theft) with a four-year supervised release period.[1] J. & Comm., ECF [76], at 2. He was also ordered to pay $10,524,534.20 in restitution. *Id.* at 7.

Defendant's sentence contained a downward variance from the applicable USSG range. Govt.'s Resp. 13. During pretrial detention, defendant had been incarcerated at Multnomah County Inverness Jail ("MCIJ"), where there were issues with his medical care. Judge Mosman granted the variance after determining that medical staff had failed to obtain specialized medical care for defendant, and lied to defendant about why the care was not available. Def.'s Mot. to Reduce Sentence ("Def.'s Mot."), ECF [84], at 6.

B.    **Medical Care History**

When defendant was transported to Federal Correctional Institution Sheridan on March 7, 2023, defendant had corneal ectasia in both eyes and nerve damage in his lower extremities, either from

---

[1] Defendant was also sentenced for convictions in a separate case, No. 3:22-cv-00224, in which he was indicted for distributing, and possessing with the intent to distribute, controlled substances. That sentence runs concurrently with the forty-six-month sentence for wire fraud.

Guillain-Barre Syndrome or vasculitis neuropathy. *Id.* at 2. Doctors at the Casey Eye Clinic and the Oregon Health & Science University ("OHSU") neurology department had recommended that defendant see a cornea specialist for laser surgery, a neurosurgeon to implant a spinal stimulator to alleviate pain from the nerve damage, and a pain specialist. *Id.* Although MCIJ had made appointments for defendant to see a cornea specialist and neurosurgeon in May 2023, he was transferred to Sheridan before he could attend these appointments. *Id.* at 6-7.

      Defendant underwent a health screening upon arriving at Sheridan. Govt.'s Opp'n, Ex. A, at 59-66. He alleges that Sheridan medical staff immediately removed any medicine that MCIJ medical staff had prescribed for him. Def.'s Mot. 4. Sheridan medical staff allegedly explained that they would need to independently determine what medicine defendant would receive, and that they would determine defendant's plan of care. *Id.* At that time, Sheridan medical staff determined that defendant suffered from opioid use disorder. Govt.'s Opp'n, Ex. A, at 57.

      From March 17, 2023, through August 21, 2023, defendant submitted approximately nineteen Inmate Request to Staff Intake Forms ("Inmate Forms") related to his medical care. Def.'s Mot., Ex. 1, at 14-29, Ex. 2, at 1-7. The forms repeatedly state that he needs to see a pain specialist, cornea specialist, and neurosurgeon. *Id.* From the submitted evidence, it appears that only six forms received a written response, all of which either told defendant to go to sick call, or advised him that he was on the "call out list." *Id.* Ex. 2, at 1-7. Defendant was seen by health services twenty-three times between March 7, 2023 and November 22, 2023. Govt.'s Opp'n, Ex. A. The majority of these visits were conducted by an Advance Practice Nurse-Board Certified nurse, who has the ability to prescribe medication, though he has also seen a medically licensed doctor once and an optometrist once. *Id.* Ex. A, at 30-31, 37.

      Defendant currently has two pending specialist referrals. On April 13, 2023, a referral was issued for defendant to see a neurosurgeon. *Id.* Ex. A, at 43. However, on May 11, 2023, the referral was changed to a neurology referral based on Sheridan's Utilization Review Committee's recommendation. *Id.* at 6, Ex. A, at 33. On October 27, 2023, the referral was changed back to neurosurgical because defendant's OHSU medical records had arrived and reflected the neurosurgical recommendation. *Id.* at 6, Ex. A, at 4.

On May 18, 2023, the optometrist issued an ophthalmology referral and indicated that defendant needed to see a cornea specialist. *Id.* Ex. A, at 30. The optometrist labeled the priority of the referral as "Emergent" and set a target date for June 23, 2023. *Id.*

The government obtained information from the BOP regarding the status of these referrals after oral argument, upon the Court's request. That information was reviewed *in camera* and defendant has two appointments scheduled at OHSU in March. Defendant subsequently filed a Motion to Allow Defense Counsel to Review the *In Camera S*ubmission. Def.'s Mot. to Allow Def. Counsel to Rev. Govt.'s In Camera Subm., ECF [103]. The government opposes the motion.

Because the pleadings were not clear, the Court clarified on the record at oral argument any differences between defendant's health at the time he entered Sheridan and his present condition. When defendant first arrived at Sheridan, his nerve damage issues manifested in numbness in his fingers, feet, and legs, and he had vision in both eyes. Presently, the numbness has spread to defendant's pelvis and he now uses a wheelchair to get to and from the prison dining room. He has also completely lost vision in his right eye, and has double vision in his left eye.

## DISCUSSION

As an initial matter, the Court finds that defense counsel's request to review the information viewed by the Court *in camera* on an attorney's-eyes-only basis is unnecessary and harmful to defendant's situation. The BOP affirmed that disclosure of the information beyond the Court or government would result in defendant's scheduled medical appointments being cancelled. Though defendant argues that such review is necessary to determine the purpose of the appointments, disclosing the information to defense counsel would hinder defendant, not help. That is, cancelling the appointments would only further delay defendant's ability to access the care that he needs. As the Court understands it, this BOP policy is connected to its reasonable security and safety procedures for prisoner movements.

### A.    Extraordinary and Compelling Reason

Because the government concedes that defendant has exhausted his administrative remedies, the threshold inquiry is whether defendant has demonstrated that an "extraordinary and

compelling reason" warrants a reduction of his sentence. As mentioned, USSG § 1B1.13(b)(1)(C) states that such a reason exists when "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." The government concedes that defendant is suffering from a medical condition that requires specialized medical care. However, the parties disagree as to whether that care is being provided and whether defendant is at a risk of serious deterioration in his health absent such care. Because evidence on the record indicates that the BOP has taken affirmative steps to provide defendant with specialized care, the Court finds that no extraordinary and compelling reason exists warranting a reduction of defendant's sentence.

Put simply, defendant argues that BOP is not providing the specialized care because he has not had appointments with specialists for his corneal ectasia or nerve issues, and the medical care that he has received does not adequately address his health concerns. Defendant emphasizes that the BOP started his health care from the beginning, meaning he will have to go through various stages of appointments before obtaining the treatment that he already knows he needs based on his prior care at MCIJ. Though defendant acknowledges that the BOP is processing his specialist referrals, he argues that the BOP's process has, in essence, deprived defendant of specialized care for the ten months he has been at Sheridan.

The government, however, argues that defendant is receiving the specialized care that his conditions need "in the normal course." That is, the government argues that the BOP is processing the specialist referrals, that those referrals have been approved, and that appointments have been scheduled. Further, the government highlights that the BOP has provided defendant with ongoing medical care to address his concerns while processing the specialist referrals. Put simply, in the government's view, defendant's arguments are addressed at the speed with which he is receiving specialized care, not the absence of specialized care.

There is little guidance for the meaning of the phrase "specialized medical care that is not being provided." On one hand, it is true that defendant has not seen specialists for his conditions and, thus, has not yet received specialized medical care. On the other hand, the BOP has taken affirmative steps to

obtain the specialized care that defendant needs, albeit not in the timeframe that defendant would have preferred. In essence, the question is whether a delay in obtaining specialized care is equivalent to not providing care at all.

Defendant highlights the delay aspect, noting that the BOP has required him to see an optometrist, and now an ophthalmologist, when he already saw an ophthalmologist while at MCIJ who indicated that defendant needed to see a cornea specialist. This, he argues, has caused an unnecessary delay in the provision of his specialized care. Though it is true that these BOP requirements may have hindered the expediency of defendant's care, defendant has provided no evidence that BOP health care even permits a cornea specialist referral without first consulting with an optometrist and ophthalmologist. Though defendant emphasizes that he had an appointment with a cornea specialist prior to his transfer to Sheridan, he obtained this appointment *after* seeing both an optometrist and ophthalmologist while under MCIJ care. In a similar vein, defendant has provided no evidence that, even if he were released, that he would be able to obtain specialist appointments in a shorter timeframe.

Defendant also argues that the BOP intentionally delayed his care by waiting to request and receive defendant's medical records before issuing a neurosurgeon referral and by ignoring defendant's Inmate Forms. Waiting to receive substantive medical information before issuing a referral is not unreasonable. Nor does the evidence on the record indicate that defendant's Inmate Forms were routinely ignored. That each individual form did not receive a response is not, in and of itself, evidence of an intentional delay, particularly when defendant has had twenty-three medical visits between March 2023 and November 22, 2023.

Based on the evidence presently available, the Court finds that the BOP is providing defendant with the specialized medical care that he needs. Since his arrival at Sheridan, the BOP has provided defendant with consistent medical care by (1) working to find available prescription medications that meet defendant's needs; (2) issuing specialist referrals; (3) continually consulting with defendant during medical visits regarding his health issues while awaiting referral processing; and (4) scheduling specialist

appointments. Though the process has undeniably been long, the BOP has taken affirmative steps to secure the specialized care that defendant needs.

Relevant to the Court is the distinction between the present situation and the situation before Judge Mosman at sentencing. While at MCIJ, defendant was not receiving proper medical care, in part, because defendant was inaccurately told that funding for his care was not available. That is, the facts before Judge Mosman indicated that defendant's medical care was intentionally not provided. Conversely, the evidence before this Court indicates that the BOP is not intentionally neglecting defendant's medical care, but rather that the BOP's procedures require that certain steps be taken to acquire that care. As it stands, the BOP is taking those steps.

In sum, the Court finds that defendant has not demonstrated an extraordinary and compelling reason warranting a reduction of his sentence. Though it is deeply unfortunate that defendant has experienced a decline in his health, the evidence on the record does not support a finding that defendant is not being provided the specialized medical care that he needs.

**B.      18 U.S.C. § 3553(a) Factors**

Even if defendant's circumstances established an extraordinary and compelling reason warranting a reduction in his sentence, the Court finds that the relevant 18 U.S.C. § 3553(a) factors weigh against granting a reduction of defendant's sentence.

1.      *18 U.S.C. § 3553(a)(1)*

The nature and circumstances of defendant's underlying offenses weigh against reducing his sentence. As acknowledged by Judge Mosman at sentencing, defendant's underlying offenses were undoubtedly serious. He conducted a large-scale fraudulent scheme from which he obtained a significant amount of money and utilized numerous stolen identities to effectuate his fraudulent activity. Indeed, he fraudulently obtained approximately three times as much money as the closest situated defendant prosecuted for similar crimes in this district. *See* Govt.'s Opp'n 14 (citing *United States v. Lloyd*, No. 6:21-cr-00198-MC). Additionally, defendant's personal history and characteristics do little to mitigate the severity and magnitude of his crime. On the contrary, defendant's personal background indicates that he is

sophisticated, well-educated, and had little reason or justification for his behavior.  Further, defendant's history of behavior while on pre-trial release amplify the severity of his crime.

      2.    *18 U.S.C. § 3553(a)(2)(A)-(D)*

Defendant has served approximately twenty-five months of his seventy-month sentence. His current release date, as listed on Sheridan's website, is August 31, 2026.  However, defendant argues that he will likely be released as early as February or March of 2025 after accounting for credit earned under the First Step Act.  Reducing defendant's sentence would likely not reflect the seriousness of his offenses, nor is it likely to promote respect for the law.  However, considering the medical issues that defendant has endured while in custody, reducing his sentence would likely still provide just punishment for his offense. On balance, this factor is neutral.

Adequate deterrence and protecting the public both weigh against a reduction.  The government highlights that defendant has served most of his sentence at MCIJ precisely because his initial arrest was insufficient to deter his criminal conduct.  Conversely, defendant argues that the circumstances that led to his pre-trial violation are no longer present, highlighting his completion of inpatient drug treatment and his lack of incidents while incarcerated.  While the Court acknowledges the steps that defendant has taken, evidence on the record raises serious questions as to the extent that defendant would be deterred from further crimes.

Defendant's sentence includes a restitution amount of over $10 million, and he asserts that he "disclosed his bank and investment accounts and agreed to their administrative and/or judicial foreclosure."  Def.'s Reply 7.  Yet, on July 20, 2023, defendant wrote a letter to the BOP Warden seeking an administrative remedy for his medical condition, in which he stated, "[I] can support myself with some money that I have saved."  Def.'s Mot., Ex. 3.  The contradictions in these statements and the lack of detail regarding the source of this money concern the Court.  Defendant's failure to address this statement when raised by the government only heightens the Court's concerns.  On balance, the need for adequate deterrence and protecting the public weigh against reducing defendant's sentence.

Providing defendant with necessary medical care in the most effective manner is a neutral

factor. On one hand, defendant's wait for specialized medical care has been lengthy while in BOP custody. On the other hand, defendant has not provided any substantive evidence that he could obtain medical care in a shorter timeframe than that which he is receiving in BOP custody. This is particularly true given that defendant already has appointments scheduled through BOP and reducing defendant's sentence would require that he obtain similar appointments on his own, restarting the clock once again.

      3.       *18 U.S.C. § 3553(5)*

      The most pertinent policy statement is USSG § 1B1.13 which, as already discussed, likely weighs against reducing defendant's sentence because his current circumstances do not represent an extraordinary and compelling reason warranting reduction. The government also argues, however, that Note 1 of that guideline clearly states, "A reduction of a defendant's term of imprisonment under this policy statement is not appropriate when releasing the defendant under 18 U.S.C. 3622 for a limited time adequately addresses the defendant's circumstances." USSG § 1B1.13 n.1. 18 U.S.C. § 3622(a)(3) authorizes the BOP to temporarily release prisoners on a furlough-basis, not to exceed thirty days, for the purpose of "obtaining medical treatment not otherwise available[.]" Defendant argues that a furlough is inadequate because authority to grant a furlough is reserved to the BOP, and defendant's medical issues would require multiple appointments that could not be completed in thirty days. However, defendant concedes that he has not requested a furlough because he was told that he was ineligible, and his administrative requests have not received responses.

      On balance, Note 1 of USSG § 1B1.13 increases the weight this factor holds against reducing defendant's sentence. While defendant raises concerns about the adequacy of a furlough, he has not requested a furlough, thus undermining his arguments as to its adequacy and availability as an option. Though defendant asserts that he is ineligible for a furlough because he did not voluntarily surrender, he also admits that this policy is not contained in any BOP rule or regulation. Further, nothing in 18 U.S.C. § 3622, on its face, would prohibit defendant from receiving multiple furloughs to obtain medical treatment if such treatment exceeded thirty days, provided that he returned to BOP custody intermittently.

      4.       *18 U.S.C. § 3553(6)*

The government identifies three individuals who were sentenced in this district in the last two years for crimes similar to defendant's crimes.[2]  One defendant fraudulently obtained approximately $850,000 and was sentenced to sixty-one months incarceration. Govt.'s Opp'n 14 (citing *United States v. Unitan*, No. 3:21-cr-00053-BR).  The second defendant fraudulently obtained approximately $3.6 million and is serving a sentence of forty-eight months incarceration.[3] *Id.* (citing *United States v. Lloyd*, No. 6:21-cr-00198-MC).  The third defendant fraudulently obtained approximately $1.2 million and is serving a sentence of seventy months incarceration.  *Id.* (citing *United States v. Nevis*, No. 3:22-cr-00183-IM).  In the government's view, reducing defendant's sentence would result in a grossly disparate sentence because defendant would serve less than half of the sentence imposed on similarly situated defendants.

At first glance, reducing defendant's sentence would create a disparity because his incarceration term would be significantly shorter than the defendants serving sentences for similar crimes. However, defendant's circumstances have made his sentence considerably more difficult than other defendants.  That is, defendant's sentence thus far has involved not only incarceration, but also a decline in his physical health.  Looking at the situation holistically, defendant has faced consequences in his incarceration that similarly situated defendants did not, exposing defendant to his own form of sentencing disparity.  On balance, this factor is neutral.

Having found that the relevant 18 U.S.C. § 3553(a) factors are either neutral or weigh against reducing defendant's sentence, a reduction in defendant's sentence would not be warranted even if his circumstances constituted an extraordinary and compelling reason.

---

[2] The three other defendants similarly utilized stolen identities to defraud COVID-relief programs and obtain over $500,000.

[3] The government notes that forfeiture of this defendant's assets provided the government with a gain of several million dollars.

## CONCLUSION

Accordingly, defendant's Motion to Allow Defense Counsel to Review Government's *In Camera* Submission, ECF [103], and defendant's Motion to Reduce Sentence, ECF [84], are DENIED.

IT IS SO ORDERED.

DATED this 30th day of January, 2024.

Adrienne Nelson
United States District Judge